## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-1349 consolidated with 11-128

JENNIFER ANN BREAUX

VERSUS

ST. CHARLES GAMING COMPANY, INC.
D/B/A ISLE OF CAPRI CASINO, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2005-272
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## OSWALD A. DECUIR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, Oswald A. Decuir, Marc T. Amy, and Phyllis M. Keaty, Judges.

**Saunders, J., dissents and assigns written reasons.**

**Thibodeaux, Chief Judge, dissents for the reasons assigned by Judge Saunders.**

### REVERSED, WRIT GRANTED, AND RENDERED.

**Daryl A. Higgins**
**A. Mark Flake**
**Gaudry, Ranson, Higgins & Gremillion, LLC**
**401 Whitney Avenue, Suite 500**
**Gretna, LA 70056**
**(504) 362-2466**
**Counsel for Defendants/Applicants:**
     **St. Charles Gaming Company, Inc.**
     **American Guarantee and Liability Insurance Company**

**Robert E. Morgan**
**Attorney at Law**
**125 West School Street**
**Lake Charles, LA 70605**
**(337) 474-9625**
**Counsel for Plaintiff/Respondent:**
    **Jennifer Ann Breaux**

**James F. DeRosier**
**DeRosier Law firm, L.L.C.**
**125 West School Street**
**Lake Charles, LA 70605**
**(337) 474-0820**
**Counsel for Plaintiff/Respondent:**
    **Jennifer Ann Breaux**

**DECUIR, Judge.**

Jennifer Ann Breaux sued St. Charles Gaming Co., Inc., d/b/a Isle of Capri Casino, and American Guarantee and Liability Insurance Co., under general maritime law for damages resulting from a fall on the M/V Crown, a floating casino permanently moored to a dock in Lake Charles. The trial court granted summary judgment in Breaux's favor on the issue of maritime jurisdiction and denied St. Charles Gaming's cross motion for summary judgment on the same issue. St. Charles Gaming appealed the summary judgment and filed a writ application seeking review of the denial of summary judgment in its favor. The appeal and writ application have been consolidated for our review.

The allegations in the record before us reveal that Breaux arrived at the casino in the late evening of September 11, 2004 or in the early morning hours of September 12, 2004. She became intoxicated and, at 4:00 a.m., she fell from a stairway onto the ground below, suffering serious injuries. Her blood alcohol content was measured at 0.33%. Breaux pursued her claim under the general maritime law after the trial court granted summary judgment in favor of St. Charles Gaming on the issue of whether Louisiana state law provides a remedy for damages caused by an adult's intoxication after the sale or serving of alcoholic beverages. In the first summary judgment, the trial court relied on La.R.S. 9:2800.1, which provides in part:

> The legislature finds and declares that the consumption of intoxicating beverages, rather than the sale or serving or furnishing of such beverages, is the proximate cause of any injury, including death and property damage, inflicted by an intoxicated person upon himself or upon another person.

In an effort to circumvent Louisiana's anti-dram shop liability law, Breaux alleges that her cause of action is controlled by federal maritime law which contains no similar provision barring the claims asserted herein. Breaux's claim of admiralty

jurisdiction is based on the fact that her fall occurred on a permanently moored floating casino, a watercraft she contends is a vessel in navigation for purposes of general maritime law. The trial court agreed, stating in summary judgment that "plaintiff's claim falls within admiralty jurisdiction[.]" For the following reasons, we reverse, grant the writ application, and render judgment in favor of St. Charles Gaming.

The record before us shows that the M/V Crown was originally placed into service in Lake Charles as a functioning gambling boat that would cruise the Calcasieu River and Lake Charles while providing gaming activities for its passengers. In 2001, the Louisiana legislature amended the gambling laws so as to prohibit gambling boats in Lake Charles from conducting cruises or excursions. In accordance with La.R.S. 27:65, since March 27, 2001, the M/V Crown has been docked and its licensee, St. Charles Gaming, has not conducted any cruises. The M/V Crown was fitted with four winches, each holding steel cables to permanently secure the vessel to the dock. Utilities including electricity, water, telephone, sewer, cable television, surveillance, and data processing lines were attached to the vessel from land-based sources. Since the law was changed, the crew has been significantly reduced, and the captain is no longer responsible for any navigational duties. The M/V Crown has not been licensed by the Coast Guard since 2001. Nevertheless, the vessel still contains the equipment necessary for navigation and theoretically could sail again in the future if brought back into compliance with Coast Guard regulations.

In *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 125 S.Ct. 1118 (2005), the Supreme Court discussed "the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed

2

to shore or resting on the ocean floor." 543 U.S. at 493-494. The Court explained and clarified the term "vessel in navigation" with the following analysis:

> [T]he point was that structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time. . . .
>
> Instead, the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation. A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.

543 U.S. at 496 (citations omitted.) In support of its rationale, the Court discussed with approval the long-standing case of *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S.Ct. 379 (1926), in which a wharfboat previously in navigation was no longer a "vessel" after it was permanently attached to the shore by cables and used as a floating platform to transfer freight and for storage. The Court also cited with approval *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995), a case involving a floating casino permanently moored to the shore but otherwise capable of navigation. Finding the vessel was removed from navigation, the *Pavone* court described the casino as a work platform, which status precluded it from being a vessel for purposes of the general maritime law.

Since the *Stewart* case was handed down, the United States Fifth Circuit decided *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir. 2006), which held that the M/V Crown, the same gambling boat at issue in the present case, is not a vessel for purposes of admiralty jurisdiction. St. Charles Gaming refers this court to other jurisprudence holding that, since the 2001 amendment to La.R.S. 27:65,

3

Louisiana's permanently moored casinos are not vessels in navigation for purposes of maritime jurisdiction: *Martin v. Boyd Gaming Corp.*, 374 F.3d 375 (5th Cir. 2004), *cert. denied*, 543 U.S. 1187, 125 S.Ct. 1396 (2005); *Hertz v. Treasure Chest Casino, LLC*, 274 F.Supp. 2d 795 (E.D.La. 2003); *Bourgeois v. Boomtown, LLC*, 2009 WL 5909119 (La.App. 5 Cir. 5/21/09), *writs denied*, 09-1357 (La. 9/25/09), 18 So.3d 68; *cert. denied*, ___ U.S. ___, 130 S.Ct. 1699 (2010); *In re Silver Slipper Casino Venture*, 264 Fed.Appx. 363 (5th Cir. 2008).

In this appeal, Breaux disputes the correctness of the *De La Rosa* decision, surmising the court had incomplete information regarding the M/V Crown and describing the case as a radical departure from U.S. Supreme Court jurisprudence. To the contrary, we find nothing in the *De La Rosa* opinion indicating the court had incomplete or inaccurate facts regarding the M/V Crown, and we find the jurisprudence determinative of this case to be squarely in line with the position advocated by St. Charles Gaming.

The cases relied upon by Breaux in support of maritime jurisdiction include *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043 (1995); *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892 (1990); and *Quinn v. St. Charles Gaming Co., Inc.*, 01-794 (La.App. 3 Cir. 2/6/02), 815 So.2d 963, *writ denied*, 02-694 (La. 4/12/02), 813 So.2d 412. None of these cases involve watercraft that were permanently moored to the shore. The *Quinn* case specifically pertains to the M/V Crown, but the cause of action arose in 2000, while the vessel was conducting cruises and other excursions in Lake Charles. *Sisson* focused on a yacht that caught fire while docked at a marina, and *Grubart* involved a barge used for work in the Chicago River. None of these cases pertained to vessels which had been taken out of

4

navigation as the M/V Crown was in 2001.  Breaux also cites *Bd. of Comm'rs v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008), a maritime lien case in which the court specifically noted it would use a broader definition of the term "vessel" than in a maritime tort case.

We conclude the trial court erred in finding maritime jurisdiction in this case. Breaux was injured while on a gaming boat permanently attached to the shore, not used in navigation, and not performing any traditional maritime activity.  Federal jurisprudence previously cited herein has interpreted maritime jurisdictional rules and definitions as they pertain to similar casinos, finding such casinos to be outside the definition of a "vessel in navigation."  We choose to follow that jurisprudence.  As this court stated in *Gaspard v. Transworld Drilling Co.*, 468 So.2d 692, 695 (La.App. 3 Cir. 1985), "uniformity of general maritime law is best served by following the rule established by our federal brethren."

Accordingly, we reverse summary judgment granted in Breaux's favor in the appeal filed by St. Charles Gaming.  We likewise grant the writ application filed by St. Charles Gaming seeking reversal of the denial of summary judgment on the same issue.

Summary judgment is hereby granted in favor of St. Charles Gaming, and Breaux's claims asserted under the general maritime law are hereby dismissed.  Costs of these appellate proceedings are assessed to Jennifer Ann Breaux.

**REVERSED, WRIT GRANTED, AND RENDERED.**

JENNIFER ANN BREAUX

v.

ST. CHARLES GAMING COMPANY, INC., d/b/a ISLE OF CAPRI

CASINO, ET AL.

**SAUNDERS, J. dissents and assigns written reasons.**

I disagree with the majority opinion in both its methodology and result regarding whether the M/V Crown is a "vessel" for purposes of federal admiralty jurisdiction, and whether federal admiralty jurisdiction is proper. Regarding methodology and whether the M/V Crown is a "vessel," the majority opinion seems to draw a bright-line rule that since our legislature enacted La.R.S. 27:65 "Louisiana's permanently moored casinos are not vessels in navigation for purposes of maritime jurisdiction." Such a bright-line rule does not follow the methodology that is mandated by the United States Supreme Court in *Stewart v. Dutra Construction Company*, 543 U.S. 481, 125 S.Ct. 1118 (2005).

The *Stewart* court, as courts have done since nearly the dawn of this issue, looked to 1 U.S.C.A. §3 to determine if a watercraft is a "vessel." "The word 'vessel' includes *every* description of watercraft or other artificial contrivance used, or *capable of being used*, as a means of transportation on water." 1 U.S.C.A. §3 (emphasis added). The majority opinion fails to specifically address whether the M/V Crown fits within the language of 1 U.S.C.A. §3. Instead, it cites *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5ᵗʰ Cir. 2006) as support for its conclusion that

the M/V Crown is not a "vessel" for purposes of federal admiralty jurisdiction. It is true that in *De La Rosa* the United States Fifth Circuit found that the M/V Crown was not a "vessel" in navigation for purposes of maritime jurisdiction. However, Breaux contends that the record available to the *De La Rosa* court was insufficient and explains that this insufficiency is why the United States Fifth Circuit reached its conclusion. Our court is not privy to the record available to the *De La Rosa* court. An appellate court decides its cases on the record before it. See La.Code Civ.P. art. 2164. I feel that this court should focus on the record before it and make a proper analysis of whether the M/V Crown is a "vessel" under 1 U.S.C.A. §3 rather than create a hard and fast rule that federal admiralty jurisdiction does not apply to all permanently moored watercraft casinos in Louisiana.

As previously stated, I also do not agree with the result of the majority opinion regarding whether the M/V Crown is a "vessel" for purposes of federal admiralty jurisdiction. My reading of the record before us is that the M/V Crown is clearly "a watercraft capable of being used as a means of transportation on water." 1 U.S.C.A. §3. The majority opinion states, "the [M/V Crown] still contains the equipment necessary for navigation and, theoretically, could sail again in the future if brought back into compliance with Cost Guard regulations." My reading of 1 U.S.C.A. §3 is that having the proper paperwork from the Coast Guard is not a factor in whether a watercraft is a "vessel" for federal admiralty jurisdiction purposes. Rather, this statement made by majority opinion that the M/V Crown "contains the equipment necessary for navigation and . . . could sail again in the future" is all that is necessary for this watercraft to be a "vessel" under 1 U.S.C.A. §3.

Further, my opinion that the M/V Crown is a "vessel" under 1 U.S.C.A. §3

does not end the analysis necessary to determine whether federal admiralty jurisdiction is applicable to the case before us. Federal admiralty jurisdiction and vessel status are separate issues.

The majority opinion finds no federal admiralty jurisdiction in this case. Again, I disagree with the majority opinion's methodology and result.

The proper methodology is set forth in *Grubart, Inc. v. Great Lakes Dredge & Dock Company*, 513 U.S. 527, 534, 115 S.Ct. 1043, 1048 (1995). In *Grubart*, the United States Supreme Court, when discussing the proper test to determine whether federal admiralty jurisdiction is applicable to a case before a court, stated the following:

> a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. §1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. 46 U.S.C.App. § 740. The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved," [*Sisson v. Ruby*, 497 U.S. [358], at 363, 110 S.Ct. [2892], at 2896, to determine whether the incident has "a potentially disruptive impact on maritime commerce," id., at 364, n. 2, 110 S.Ct., at 2896, n. 2. Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." Id., at 365, 364, and n. 2, 110 S.Ct. At 2897, 2896, and n. 2.

*Grubart, Inc.*, 513 U.S. at 534, 115 S.Ct. at 1048.

Accordingly, the proper methodology consists of a determination of whether Breaux has met the location test and the two prongs of the connection test. Here, the majority opinion fails to address the location test or the first prong of the connection test. Rather, it simply states "Breaux was injured while on a gaming boat . . . not performing any traditional maritime activity."

Finally, I disagree with the result of the majority opinion that federal admiralty

jurisdiction is not applicable to this case. Clearly, Breaux has met the location test. The alleged tort, serving excessive alcoholic beverages to an intoxicated passenger, occurred on navigable water, i.e. the Calcasieu River.

I also feel that Breaux has met the first prong of the connection test. This court, in *Quinn v. St. Charles Gaming Co., Inc.*, 01-794, p. 4 (La.App. 3 Cir. 2/6/02), 815 So.2d 963, 967, *writ denied*, 02-694 (La. 4/12/02), 813 So.2d 412, dealt with an issue nearly identical to the one before us. In *Quinn*, the estate of a motorist who was killed in a collision with an extremely intoxicated casino patron brought a tort action against the casino boat company for its provision of excessive amounts of alcohol to the patron without adequate supervision. This court, in determining whether Quinn's estate met the first prong of the connection test heeded the direction of *Grubart*, 513 U.S. at 538-39, 115 S.Ct. at 1051 and determined "the intermediate level of possible generality." It did so by describing it "as the provision of alcohol to passengers on board a vessel without adequate supervision, with the occurrence of damages on land." *Quinn*, 815 So.2d at 967.

Here, the incident can be characterized "as the provision of alcohol to passengers on board a vessel without adequate supervision, with the occurrence of damages" on that very same boat. *Id*. The *Quinn* court then found that "the provision of alcohol in this manner could possibly have a disruptive effect on maritime commerce, such as where a large party of passengers become inebriated injuring themselves or other patrons or fall overboard causing a disruption to maritime commerce due to search and rescue operations." Based on the reasoning of *Quinn*, I feel that Breaux has met the first prong of the connection test.

Likewise, I feel that the *Quinn* court's reasoning dictates a finding that Breaux also met the second prong of the connection test. The second prong of the connection test was discussed in *Grubart*, 513 U.S. at 539-40, 115 S.Ct. At 1051, wherein the United States

Supreme Court stated:

> In the second *Sisson* enquiry, we look to whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. We ask whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand.

In performing the proper analysis of the connection test, the *Quinn* court stated, "[w]e have no difficulty in finding that the general character of the activity at issue shows a substantial relationship to a traditional maritime activity. The duties owed by vessel owners to their passengers have long been found a traditional maritime concern." *Quinn*, 815 So.2d at 968. I agree with the *Quinn* court. Carrying passengers and providing for their safety are clearly a traditional maritime activities.

The majority opinion distinguishes *Quinn* from the case before us by pointing out that *Quinn* was decided while the M/V Crown was conducting cruises. While this is accurate, whether the M/V Crown was conducing cruises is not relevant as to why Breaux cited *Quinn*. Breaux cited *Quinn* to bolster her position that this court has already reached a determination on whether federal admiralty jurisdiction is applicable to the M/V Crown in its distribution of alcoholic beverages to patrons and the resulting damages. Whether the M/V Crown conducts cruises is a relevant factor in determination of its status as a "vessel," not a fact conveniently necessitating disregard through distinguishment.

In my view, given the analytical framework established by the United States Supreme Court, and the proper application of that framework, federal admiralty jurisdiction applies to the case before us. Accordingly, I would affirm the trial court and deny the writ.

I would note that the defendant, St. Charles Gaming Company, Inc. (St. Charles), while conceding the capability of the M/V Crown to be used in navigation, countered that it would lose its gaming license if it did navigate. What St. Charles does not say is that the

legislation prohibiting its gaming while in navigation was enacted at its request and the request of all gaming watercraft owners. They did so to increase their profits by decreasing their costs through employing a smaller crew and increasing their revenue by not having players leave the watercrafts rather than be trapped on them during a cruise. St. Charles has benefitted greatly from the legislature granting its request. Not satisfied, it now invites us to relieve it from Jones Act Protection for its crew and passengers as a byproduct of legislature that has already given it great benefit. In my view, we should decline this invitation. Accordingly, I respectfully dissent.